IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

**FILED** ____ ____
**LODGED** ____ ____

**JUL 18 2000**

AT ____
**CLERK U.S. DISTRICT COURT**
**DISTRICT OF MARYLAND**
**BY** _____ **DEPUTY**

COSTAR GROUP, INC. et al.          :

                                   :

v.                                 :   Civil Action No. DKC 99-2983

                                   :

LOOPNET, INC. et al.               :

                                   :

### MEMORANDUM OPINION

On February 10, 2000, the court ordered Defendant De Andre to submit to another deposition on the issue personal jurisdiction after finding his counsel had "impeded and frustrated the fair examination of De Andre" on that issue during his initial deposition. In addition, pursuant to Rules 30(d)(2) and 37(a)(4), the court ordered De Andre's counsel to pay the reasonable costs and attorney's fees associated with retaking De Andre's deposition and filing the motion to compel his deposition testimony. CoStar has now deposed De Andre pursuant to the court's Order and the parties have submitted additional briefing on the issue of personal jurisdiction. The court also has CoStar's statement of expenses and LoopNet's response thereto.

## I.   Background

Plaintiffs, CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively "CoStar"), both Delaware corporations with their principal place of business in Maryland, are in the business of creating, producing and distributing databases containing

photographs and descriptions of commercial real estate. CoStar licenses the databases to clients with an interest in the commercial real estate market, such as brokers, investors, developers, lenders and purchasers.

Defendant LoopNet, a California corporation with its principal place of business in San Francisco, is an Internet-based commercial real estate listing service. LoopNet describes its real estate listing service as a "web hosting service for users who wish to advertise real estate over the internet."[1] Through LoopNet's Internet web site, commercial real estate professionals and other users can upload or "post" real estate listings, complete with descriptive text and photographs of the property, to be viewed by other users whose search criteria match the property listing. According to LoopNet, the posting of real estate listings is done by the user and is almost entirely automated. To post a property listing, a user completes an on-line form by providing certain required information and, if desired, attaching a photograph of the property. After a user submits a real estate listing with a photograph, a LoopNet employee reviews the photograph to make sure it is a photograph of commercial real estate and not, for example, pornography. LoopNet claims that it also reviews photographs to

---

[1]    The court makes no determination at this point as to whether LoopNet is a "service provider" within the meaning of 17 U.S.C. § 512(k)(1) or is otherwise entitled to the protections of the Digital Millennium Copyright Act.

see whether they bear a copyright notice. Only after this review by a LoopNet employee is the photograph posted on the LoopNet web site with the property listing posted by the user. Users cannot post photographs directly to the LoopNet web site.[2]

LoopNet's web site is accessible to Maryland residents and contains listings for Maryland properties. Real estate professionals can post their Maryland listings directly from the LoopNet web site (www.loopnet.com) or through the web sites of two Maryland "participating organizations" that use LoopNet's commercial real estate listing service. The two Maryland participating organizations, the Greater Washington Commercial Association of REALTORS ("GWCAR") and the Mid-Atlantic Real Estate Marketing Association ("MAREMA"), are regional associations for real estate professionals that serve the commercial real estate markets in Maryland, Northern Virginia and the District of Columbia. As participating organizations, both GWCAR and MAREMA have links to the LoopNet listing service on their web sites. Users can also search LoopNet listings directly from the GWCAR and MAREMA web sites.[3]

---

[2] In addition to the listing service, LoopNet provides other services through its web site based on the content of the Internet real estate listings. For example, "LoopLeads" permits a user to enter search criteria and receive e-mail updates from LoopNet of new property listings with an Internet link to those properties on LoopNet's listing service. "MarketNow" is a service through which users are sent brochures on properties contained in LoopNet's listing service based on matches with a user's search criteria.

[3] This is made possible by the incorporation of LoopNet's
(continued...)

3

This action arises out of allegations that LoopNet has posted on its web site several photographs from CoStar's databases, including photographs of Maryland properties submitted through the GWCAR and MAREMA web sites.  CoStar alleges that LoopNet has thereby infringed CoStar's copyright in the photographs and is liable for direct and contributory copyright infringement.[4]

CoStar has also named Dennis De Andre, president and CEO of LoopNet and a member of its board of directors, as a defendant. CoStar alleges De Andre is vicariously liable for LoopNet's copyright infringement.  De Andre founded LoopNet in 1995 with Michael Keene, who De Andre described as a passive owner, and originally owned 67% of the company.  Several rounds of financing from venture capitalists have reduced his ownership interest, but De Andre retains a considerable equity interest in the company.  As president and CEO, De Andre "help[s] guide the overall direction of the company, both in terms of its business model and its financial dealings."  He is involved in product development, fund-raising and

---

[3](...continued)
search engine into the web sites of the participating organizations.  In the case of GWCAR, the search engine was incorporated "transparently," which gives users of the GWCAR web site the impression that properties listed in response to a search are the product of GWCAR, when in reality they have accessed the LoopNet database of properties.  The record does not indicate whether the search engine on MAREMA's web site is transparent.

[4]     CoStar has also asserted claims for violations of the Lanham Act, unfair competition, intentional interference with business relations and unjust enrichment.

4

the general management of the company. He also appears to have the
right and ability to control decisions relating to the posting of
real estate listings and photographs by LoopNet users and to
determine LoopNet's copyright policy.   For example, De Andre
testified at his deposition that he was consulted directly when
there were questions regarding potentially infringing photographs.

De Andre was involved in establishing LoopNet's affiliation
with GWCAR, which has its principal place of business in the
District of Columbia.  De Andre initiated the relationship with a
letter offering to help GWCAR advertise its listings on the
Internet by making LoopNet services available through the GWCAR web
site.   He testified that he helped GWCAR prioritize its products
and acted as a liaison between LoopNet and GWCAR.  De Andre also
negotiated and signed the contract with GWCAR that gave LoopNet the
exclusive right to market GWCAR commercial real estate listings on
the Internet.  CoStar's argument that this court has jurisdiction
over De Andre is based primarily on De Andre's contacts with GWCAR.

## II.  **Analysis**

### A. Personal Jurisdiction

When a court's power to exercise personal jurisdiction over a
nonresident defendant is challenged by a motion under Fed. R. Civ.
P. 12(b)(2), "the jurisdictional question thus raised is one for
the judge, with the burden on the plaintiff ultimately to prove the
existence of a ground for jurisdiction by a preponderance of the

evidence." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). If the existence of jurisdiction turns on disputed facts, the court may resolve the challenge after a separate evidentiary hearing, or may defer ruling pending receipt at trial of evidence relevant to the jurisdictional question. *Id.* If the court chooses to rule solely on the basis of the complaint, affidavits and discovery materials, "the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis in order to survive the jurisdictional challenge." *Id.; see Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 628 (4th Cir. 1997); *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993); *see also American Tel. & Tel. Co. v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996); *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990). "In deciding whether the plaintiff has proved a prima facie case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan*, 2 F.3d at 60.

As noted in the court's prior opinion, Maryland's long-arm statute permits the exercise of personal jurisdiction to the limits permitted by federal due process. *See Hansford v. District of Columbia*, 329 Md. 112, 128 n.7, 617 A.2d 1057, 1064 n.7 (1993). Thus, the only inquiry for the court is whether De Andre has certain "minimum contacts" with Maryland such that the maintenance

6

of this suit does not offend "traditional notions of fair play and substantial justice." *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, (1940)); *Ellicot Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 477 (4th Cir. 1993). The crucial issue is whether the defendant's contacts with the forum state are substantial enough that he reasonably could "expect to be haled before a [Maryland] court." *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977). A defendant has fair warning that he might be subject to a forum's jurisdiction if he purposefully directs his activities at forum residents and "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984); *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). It is not necessary that the defendant ever actually enter the forum state's territory; so long as the defendant has purposefully directed his activities toward the forum state, and the litigation arises from those activities, due process is satisfied. *Id.* at 476 ("[W]e have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction." (citing *Keeton,* 465 U.S. at 774-75)). With regard to jurisdiction over corporate employees, the Supreme Court has made clear that the employee's contacts are not to be judged by the corporation's activities in the forum; rather, the court must look at the degree to which the employee personally participated in

the alleged wrongdoing. *Calder v. Jones*, 465 U.S. 783, 790 (1984) (citing *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)); *see Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 n.13 (1984) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him.").

CoStar relies primarily on De Andre's dealings with GWCAR to support its jurisdiction argument. CoStar argues that De Andre directed his activities toward Maryland when he solicited and negotiated the exclusive listing agreement between LoopNet and GWCAR, allowing its members to submit photographs of commercial properties in Maryland, Virginia and the District of Columbia for posting on LoopNet's web site. CoStar further argues that De Andre's liability arises in part from his Maryland directed activity because infringing photographs of Maryland properties have been posted on the LoopNet web site as a result of the LoopNet/GWCAR agreement. In addition, CoStar claims that the agreement negotiated by De Andre has resulted in the distribution of infringing photographs to Maryland GWCAR members who can access LoopNet listings through the GWCAR web site. Finally, CoStar appears to argue that LoopNet's display and distribution of infringing photographs in Maryland through its web site supports jurisdiction over De Andre because he has general supervisory and policy making authority regarding the posting of photographs.

There is no evidence that De Andre ever entered Maryland in connection with the GWCAR agreement or other LoopNet business. CoStar, therefore, relies on the "effects" test to establish jurisdiction. Under the "effects" test articulated by the Supreme Court in *Calder v. Jones*, 465 U.S. 783, 787 n.6, 789-90 (1984), a court may exercise personal jurisdiction over a nonresident defendant acting outside the forum who intentionally directs tortious conduct toward the forum state knowing it will cause harm to a forum resident. In *Calder*, the Court found it was appropriate to exercise personal jurisdiction in California over two Florida residents who wrote and edited an allegedly libelous article about actress Shirley Jones because the defendants knew the article would have a "potentially devastating impact" on Jones and knew that the "brunt" of that injury would be felt by Jones in California, where she lived and worked and where the National Enquirer had its largest circulation. *Id.* at 789-90. The court held that because the defendants' intentional and allegedly tortious actions were expressly aimed at California, they must reasonably have anticipated being haled into court there to answer for their conduct. *Id.* In reaching its conclusion, the Court was careful to distinguish between the defendants' conduct and "mere untargeted negligence" that has an effect in the forum.

The mere fact that a nonresident defendant's act causes an effect in the forum state, or even that such effect was

9

foreseeable, in not enough by itself to support jurisdiction under *Calder*. Since *Calder*, courts have carefully limited the application of the effects test to cases where the nonresident defendant commits an intentional tort knowing the conduct will cause harm to the plaintiff in the forum state. The Court of Appeals for the Third Circuit summarized the scope of the effects test in *IMO Industries, Inc. v. Kiekirt AG*, 155 F.3d 254 (3d Cir. 1998):

> We believe that the *Calder* "effects test" requires the plaintiff to show the following: (1) The defendant committed an intentional tort; (2) The plaintiff felt the brunt of the harm in the forum such that the forum can be said to be the focal point of the harm suffered by the plaintiff as a result of that tort; [and] (3) The defendant expressly aimed his tortious conduct at the forum such that the forum can be said to be the focal point of the tortious activity. . . . [I]n order to make out the third prong of this test, the plaintiff must show that the defendant knew that the plaintiff would suffer the brunt of the harm caused by the tortious conduct in the forum, and point to specific activity indicating that the defendant expressly aimed its tortious conduct at the forum.

*Id.* at 265-66; *see also Maggos v. Helm*, 1999 WL 402448, at *1-2 (9th Cir. June 30, 1999) (jurisdiction under *Calder* requires intentional tortious act by nonresident defendant that defendant knows is likely to cause harm in forum state (citing *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1486 (9th Cir. 1993))); *Waffenschmidt v. Mackay*, 763 F.2d 711, 723 (5th Cir. 1985) ("[I]n all cases," to satisfy the effects test "the effect in the forum

10

must have been purposeful"); *Simon v. Philip Morris, Inc.*, 86 F.
Supp. 2d 95, 132 (E.D.N.Y. 2000) ("The main point of the [*Calder*]
case is its distinction between intentional and negligent
wrongdoing for purposes of assessing minimum contacts. Where
intentional misconduct is at issue, the wrongdoer should reasonably
anticipate being called to answer for its conduct wherever the
results of that conduct are felt."); *First Trust Nat'l Ass'n v.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre*, 996 F. Supp.
585, 590 (S.D. Miss. 1998) ("The effects test is generally
associated with allegations relating to intentional torts."); *EFCO
Corp. v. Aluma Sys., USA, Inc.*, 983 F. Supp. 816, 821 (S.D. Iowa
1997) ("Two conditions must be met for the *Calder* effects test to
apply. First, the defendant's act must be intentional and not
merely negligent. Second, the 'focal point' of the act, i.e.,
where the 'brunt' of the harm is intended, must be within the
chosen forum."); *Zumbro, Inc. v. California Natural Prods.*, 861 F.
Supp. 773, 782 (D. Minn. 1994) (noting that the effects test
"generally has been limited to intentional torts").

Several courts have applied *Calder* in the context of
intellectual property claims. In each case where jurisdiction was
found to be proper, there was also a finding that the infringement
was intentional. In *Panavision International, L.P. v. Toeppen*, 141
F.3d 1316 (9th Cir. 1998), the Court of Appeals for the Ninth
Circuit found that personal jurisdiction existed in California over

11

an Illinois resident who engaged in a scheme to register Panavision's trademarks as Internet web site domain names for the purpose of extorting money from Panavision. The court held that the "purposeful availment" requirement necessary for specific personal jurisdiction was satisfied under the effects test because Toeppen's conduct, "as he knew it likely would, had the effect of injuring Panavision in California where Panavision has its principal place of business and where the movie and television industry is centered." *Id.* at 1321-22. In *Dakota Industries, Inc. v. Dakota Sportswear, Inc.*, 946 F.2d 1384 (8th Cir. 1991), a trademark infringement case, the court found jurisdiction over a California corporation in South Dakota proper because the case involved "intentional tortious wrongdoing -- namely, the use of the trademark with knowledge of the infringement" that was "uniquely aimed at the forum state" with knowledge that the injury would be felt by the plaintiff in South Dakota. *Id.* at 1391; *see also MCA Records, Inc. v. Charly Records, Ltd.*, 1997 WL 76173, at *8 (9th Cir. Feb. 21, 1997) (defendants that knew of plaintiff's trademark rights, knew plaintiff was a California corporation and knew that their actions would result in infringing products being distributed in the United States, including California, were subject to jurisdiction under the reasoning of *Calder*); *Nissan Motor Co. v. Nissan Computer Corp.*, 89 F. Supp. 2d 1154, 1160 (C.D. Cal. 2000) (effects test satisfied where defendant used plaintiff's trademark

12

in a manner intended to exploit plaintiff's goodwill and profit from consumer confusion).

In this case, there is no evidence of intentionally tortious conduct on the part of De Andre.  It is clear that through his contacts with GWCAR De Andre intended to cause photographs of Maryland properties to be posted on the LoopNet web site and viewed by Maryland users.  However, there is nothing in the record to indicate that De Andre knew his conduct would result in the posting of photographs that infringe CoStar's copyrights.  Additionally, the connection between De Andre's contacts with GWCAR and the allegedly infringing activity is rather tenuous.  The decision by a broker or other CoStar licensee to submit a photograph from the CoStar database for posting is a significant intervening factor. And while it was perhaps foreseeable that infringing photographs would be submitted and posted, *Calder* did not turn on the mere foreseeability of injury to a citizen of the forum, but rather on the fact that injury was caused by activity intentionally directed by defendants at the plaintiff and her forum.  *Calder*, 465 U.S. at 789-90; *see also World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) ("'[F]oreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause.").

De Andre's closest connection with the alleged infringing activity, the actual posting and distribution of photographs, is

13

that he appears to have the right and ability to control decisions relating to the posting of photographs by LoopNet users and to determine LoopNet's copyright policy. Obviously, if CoStar's allegations regarding infringement are true, LoopNet's copyright policy was not adequate for the purpose of preventing copyright infringement. There is no evidence to suggest, however, that in establishing that policy De Andre intended to harm the copyright interests of others. Furthermore, the evidence indicates that once De Andre was made aware of the allegations of infringement he directed that the allegedly infringing pictures be removed from the LoopNet web site.

De Andre's conduct in relation to the allegedly infringing activity can at most be characterized as negligent. Although the distinction between negligent and intentional infringement is irrelevant for purposes of liability, *see Educational Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087 (C.D. Cal. 1999) (copyright infringement is a strict liability tort), it is dispositive in the *Calder* "effects" analysis, *see Figi Graphics, Inc. v. Dollar Gen. Corp.*, 33 F. Supp. 2d 1263, 1267 (S.D. Cal. 1998) (effects test not satisfied where plaintiff "failed to present any evidence demonstrating that [defendant] 'intentionally' infringed upon [plaintiff's] copyrights."). CoStar has thus failed to make the required prima facie showing that De Andre intentionally directed

14

tortious conduct toward CoStar and Maryland.   Accordingly, De Andre's motion to dismiss will be granted.

## B. Attorney's Fees and Costs

Pursuant to Rules 30(d)(2) and 37(a)(4) the court has ordered De Andre's counsel to pay the "reasonable costs and attorney's fees incurred in connection with bringing the motion to compel and with the retaking of De Andre's deposition." In determining the proper fee award, the court starts with the "lodestar" figure, which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *see Envirosource, Inc. v. Horsehead Resource Dev. Co.*, 981 F. Supp. 876, 881 (S.D.N.Y. 1998) (using lodestar method to award attorney's fees as sanction for discovery violation); *Trbovich v. Ritz-Carlton Hotel Co.*, 166 F.R.D. 30, 32 (E.D. Mo. 1996) (same); *Bowne of New York City, Inc. v. AmBase Corp.*, 161 F.R.D. 258, 266 (S.D.N.Y. 1995) (same). Absent circumstances warranting adjustment, the lodestar figure represents the proper total fee award. *Wileman v. Frank*, 780 F. Supp. 1063, 1064 (D. Md. 1991) (citing *Blum v. Stenson*, 465 U.S. 886, 888 (1984)). In deciding what constitutes a "reasonable" number of hours and rate, the district court generally is guided by the following factors:

> "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the

15

> attorney's opportunity costs in pressing the
> instant litigation; (5) the customary fee for
> like work; (6) the attorney's expectations at
> the outset of the litigation; (7) the time
> limitations imposed by the client or
> circumstances; (8) the amount in controversy
> and the results obtained; (9) the experience,
> reputation and ability of the attorney; (10)
> the undesirability of the case within the
> legal community in which the suit arose; (11)
> the nature and length of the professional
> relationship between attorney and client; and
> (12) attorneys' fees awards in similar cases."

*Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998) (quoting *EEOC v. Service News Co.*, 898 F.2d 958, 965 (4th Cir. 1990) (quoting *Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978))). LoopNet challenges the reasonableness of hours claimed and rates charged by CoStar's counsel as well as the amount of their expenses.

### 1. Reasonable Billing Rate

"To inform and assist the court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *See Blum*, 465 U.S. at 896 n.11. A rate determined in this way is normally deemed reasonable, and is referred to as the prevailing market rate. *Id.* Evidence of the prevailing market rate usually takes the form of affidavits from other counsel attesting to their rates or the prevailing market rate. *See, e.g., Glover v. Johnson*,

16

934 F.2d 703, 716-17 (6th Cir. 1991) (affirming award where "third-party affidavits submitted by plaintiffs established the prevailing market rate"). However, in the absence of sufficient documentation, the court may rely on its own knowledge of the market. *See Norman v. Housing Auth.*, 836 F.2d 1292, 1303 (11th Cir. 1988) ("'The court . . . is itself an expert on the question [of reasonableness] and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value.'" (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940))); *Miele v. New York State Teamsters Conference Pension & Retirement Fund*, 831 F.2d 407, 409 (2d Cir. 1987) (holding that a district judge may rely on his own knowledge of private firm hourly rates in the community in determining the prevailing market rate); *Lucero v. City of Trinidad*, 815 F.2d 1384, 1385 (10th Cir. 1987) (holding that absent other evidence of prevailing market rates, the district judge may establish a reasonable rate based on his familiarity with the prevailing rates in the area).

CoStar requests the following rates for its attorneys and paralegals:

| Charles Ossola | - | $420 per hour |
| Carol Lally | - | $250-260 per hour |
| Christopher Winters | - | $185-195 per hour |
| Paralegal | - | $70 per hour |

Mr. Ossola is a partner at the law firm of Arnold & Porter and has been practicing law for 22 years. Ms. Lally is an associate at

Arnold & Porter and has been admitted to the bar for approximately
5 years. Mr. Winters, also an associate at Arnold & Porter, has
been admitted to the bar for approximately 2 years.

CoStar has provided no evidence regarding the prevailing
market rate, and LoopNet vigorously challenges the reasonableness
of these rates. The court agrees that the rates claimed exceed
those usually charged for similar work by lawyers practicing before
this court. Based on the court's knowledge of rates charged by
local firms for similar work and experience in awarding attorney's
fees in copyright cases, the court finds the following rates to be
reasonable:

```
Charles Ossola          -    $250 per hour
Carol Lally             -    $180 per hour
Christopher Winters -        $140 per hour
Paralegal               -    $65 per hour
```

### 2. Reasonable Hours

A fee applicant has the burden of proving hours to the
district court by submitting contemporaneous time records that
reveal all hours for which compensation is requested and how those
hours were allotted to specific tasks. *In re Olson*, 884 F.2d 1415,
1428 (D.C. Cir. 1989); *Lightfoot v. Walker*, 826 F.2d 516, 523 n.7
(7th Cir. 1987); *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952
(1st Cir. 1984); *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983);
*New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d
1136, 1148 (2d Cir. 1983). The records must specify, for each
attorney, the date, the hours expended and the nature of the work

18

done. *See Carey*, 711 F.2d at 1148. The court may reduce the number of hours awarded if the documentation is vague or incomplete. *See Hensley*, 461 U.S. at 433 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *League of United Latin Am. Citizens v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1233 (5th Cir. 1997) ("Litigants take their chances by submitting fee applications that are too vague to permit the district court to determine whether the hours claimed were reasonably spent."). "[C]ounsel, of course, is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures." *Hensley*, 461 U.S. at 437 n.12.

After reviewing the billing records submitted, the court must ensure that the prevailing attorneys have exercised "billing judgment." *Id.* at 434. Billing judgment consists of winnowing the hours actually expended down to the hours reasonably expended. Time that is "excessive, redundant, or otherwise unnecessary" should be excluded. *Id.*

CoStar claims the following hours were reasonably expended in prosecuting the motion to compel and retaking De Andre's deposition:

```
Charles Ossola        -     9.5 hours
Carol Lally           -     7.5 hours
Christopher Winters -      38.5 hours
Paralegal             -     4.5 hours
```

19

LoopNet challenges the amount of time spent by CoStar's counsel as unreasonable and the result of over-lawyering. LoopNet also challenges the adequacy of documentation provided by CoStar's counsel. CoStar's counsel did not provide contemporaneous time records for the court's review. They have instead provided a typed listing that appears to be drawn from contemporaneous records. The records will suffice for purposes of this motion because they provide an adequate basis for determining whether the hours claimed were reasonably expended, but the court reiterates that contemporaneous time records generally are the required method of proving hours, and any future request for fees in this case must be accompanied by such records.

LoopNet first argues that the 44.75 hours claimed in connection with the motion to compel, including 37.5 hours by Mr. Winters, is excessive. The court agrees. As LoopNet notes, the motion dealt with a single, uncomplicated issue concerning instructions not to answer and should not have required nearly 45 hours of work. Additionally, there appears to be some duplication of effort among the attorneys and paralegals. Accordingly, the court will reduce Mr. Winters' time by 12 hours and reduce paralegal time by 2 hours.

LoopNet also argues that 15.25 hours for retaking De Andre's deposition, which lasted only 2.5 hours, is excessive. CoStar argues that the 12.75 hours of preparation time was necessitated by

a new production of documents made two days prior to De Andre's second deposition. According to CoStar, these documents had to be reviewed for relevance to the issue of personal jurisdiction. LoopNet, on the other hand, contends that CoStar's counsel was prepared for the second deposition on December 16, 1999, when the first deposition was held. The purpose of the second deposition, according to LoopNet, was simply to get answers to questions previously prepared and asked at the first deposition. The court finds that some additional preparation time was appropriate, but that 12.75 hours is unreasonable. CoStar would have had to review the new documents regardless of the need to retake De Andre's deposition. The court will therefore eliminate the 1 hour spent by Mr. Winters reviewing documents "for possible use at De Andre deposition" and the 4.75 hours billed by Ms. Lally for "review of documents in preparation for deposition" and consulting with Mr. Ossola. Mr. Ossola's time will be reduced by 3 hours.

### 3. Lodestar Calculation

After making the hour and rate adjustments discussed above, the court arrives at the following lodestar calculation:

| Attorney | | Reas. Hours | Reas. Rate | Lodestar |
|---|---|---|---|---|
| Charles Ossola | – | 6.5 | $250 | $1625.00 |
| Carol Lally | – | 2.75 | $180 | $495.00 |
| Christopher Winters | – | 25.5 | $140 | $3570.00 |
| Paralegal | – | 2.5 | $65 | $162.50 |
| | | | Total | $5852.50 |

21

### 4. Costs

The court will not allow CoStar to recover any portion of the cost of counsel's flight to San Francisco because Mr. Ossola was already scheduled to fly there for other depositions in this case. The court also finds that $465.00 for Westlaw research on the motion to compel is excessive and will allow only $150. The remaining expenses, for an extra night of lodging, an extra day of car rental and court reporting fees, were properly documented and incurred as a direct result of defense counsel's actions at De Andre's first deposition. The court, therefore, will award CoStar $1268.08 in costs.

### III. **Conclusion**

For the reasons set forth above, the court shall GRANT De Andre's motion to dismiss and order De Andre's counsel to pay CoStar $7120.58 as the reasonable costs and attorney's fees incurred in connection with bringing the motion to compel and retaking De Andre's deposition.

A separate Order will be entered.

_Deborah K. Chasanow_

DEBORAH K. CHASANOW
United States District Judge

July _17_, 2000.

22