IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SEP 26 2001

COSTAR GROUP INC., and      :
COSTAR REALTY INFORMATION,   :
INC.                         :
                             :

v.                           : Civil Action No. DKC 99-2983

                             :

LOOPNET, INC.                :

## MEMORANDUM OPINION

Presently pending and ready for resolution in this copyright infringement action are (1) Plaintiffs' motion and Defendant's cross-motion for summary judgment on the safe harbor defense under the Digital Millennium Copyright Act (paper nos. 70 and 87); (2) Plaintiffs' motion and Defendant's cross-motion for summary judgment on copyright infringement liability (paper nos. 71 and 87); (3) Defendant's motion and Plaintiffs' cross-motion for partial summary judgment on misuse and statutory damages (paper nos. 87 and 95); and (4) Plaintiffs' motions to modify the preliminary injunction (paper nos. 66, 105, and 121).[1]  Hearings were held separately on the preliminary injunction and the summary judgment motions.

---

[1] The parties have also filed motions to seal all of the motion papers because they contain proprietary or confidential information subject to protective order.  See paper nos. 67, 72, 97, 104, 108, 110, 118, and 125.  No oppositions have been received.  Those motions are GRANTED.  The parties have also moved for leave to file supplemental memoranda and responses, see paper nos. 90, 105, 109, 115, 116, 121, 122 and 127, and one to exceed the page limit, paper no. 106.  Those motions are GRANTED.

## I. Background

Plaintiffs CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively CoStar) filed suit against LoopNet, Inc. (LoopNet) alleging copyright infringement. CoStar is a national provider of commercial real estate information services. It maintains a copyrighted commercial real estate database which includes photographs. Some of the photographs are taken by professional photographers hired by CoStar either as employees or as independent contractors. CoStar licenses users of its database.

LoopNet is an internet based company offering a service through which a user, usually a real estate broker, may post a listing of commercial real estate available for lease. The user accesses and fills out a form at LoopNet's site, with the property name, type, address, square footage, age, description, identifying information, and password. The property is listed once the user submits the form. To include a photograph, however, the user must fill out another form. A photograph, once submitted, is not immediately available to the public. Instead, it is uploaded into a separate "folder," elsewhere in LoopNet's system, where it is reviewed by a LoopNet employee to determine that it is in fact a photograph of commercial property and that there is no obvious indication that the photograph was submitted in violation of LoopNet's terms and conditions. If the photograph meets LoopNet's criteria, the employee accepts the photograph and it is

2

automatically posted along with the property listing. The listing
is then made available to any user upon request.

LoopNet does not charge a fee for posting real estate listings
or for accessing those listings.[2]

In the initial complaint, CoStar claims that over 300 of its
copyrighted photographs have appeared on LoopNet's site (the number
has increased over time). CoStar contends that LoopNet is liable
for direct or contributory copyright infringement as a matter of
law, asserting that there is no material dispute of fact (1) that
it owns the copyrights in the photographs; (2) that LoopNet is
copying, distributing, and displaying; and/or (3) contributing to
the copying, distributing, and displaying of the photographs
without authorization. LoopNet's position on those issues is (1)
that CoStar authorized its customers to use the photographs on the
internet through the license agreements; (2) that its activities do
not constitute direct infringement; and (3) that it is not liable
for contributory infringement because it lacked knowledge and did
not induce, cause, or materially contribute to the infringing
conduct of others.

In addition, LoopNet contends that CoStar misused its
copyright and that it is entitled to the "safe harbor" protections
provided under the Digital Millennium Copyright Act (DMCA) as an

---

[2] LoopNet provides other services, some generating income, and
it sells advertising space on the public areas of its site.

3

"online service provider."   In response to this aspect of their
dispute, CoStar contends that LoopNet does not qualify as an
"online service provider," does not provide a "web page hosting
service," and is not entitled to the protection of the DMCA because
(1) the photographs are stored at the direction of LoopNet rather
than its users; (2) its review of the photographs prior to
permanent storage disqualifies it from protection; (3) LoopNet has
not reasonably implemented a termination policy; (4) it obtains a
direct financial benefit from the infringing photographs that
appear on its web site; and (5) it has not acted expeditiously to
remove infringing material.   CoStar contends, and LoopNet agrees,
that there is no safe harbor for photographs posted prior to
December 8, 1999, the date on which LoopNet appointed an agent to
receive notices of infringement.

LoopNet also asserts that the copyright act preempts CoStar's
non-copyright claims, and that CoStar's statutory damages are
limited to, at most, 11 (now 13) infringements.

## II. Standard of Review

It is well established that a motion for summary judgment will
be granted only if there exists no genuine issue as to any material
fact and the moving party is entitled to judgment as a matter of
law.   Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322
(1986).   In other words, if there clearly exist factual issues

4

"that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing that there is no genuine issue as to any material fact. FED. R. CIV. P. 56(c); *Pulliam Inv. Co.*, 810 F.2d at 128 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256.

In *Celotex Corp.*, the Supreme Court stated:

5

> In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex Corp.*, 477 U.S. at 324. However, "'a mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  **Analysis**

Application of copyright law in cyberspace is elusive and perplexing. The world wide web has progressed far faster than the law and, as a result, courts are struggling to catch up. Legislatures and courts endeavor in this growing area to maintain the free flow of information over the internet while still protecting intellectual property rights. The DMCA is one attempt

6

by Congress to strike the proper balance.    Understanding the interplay between basic copyright jurisprudence and the DMCA presents an additional challenge for the courts.

## A.   Direct Copyright Infringement

A *prima facie* case of direct infringement consists of proof of ownership of the allegedly infringed material and violation of at least one of the exclusive rights granted to copyright holders under 17 U.S.C. § 106.    *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

## 1. Ownership

LoopNet does not contest CoStar's assertion that it owns, in the first instance, the photographs.  Rather, in resisting summary judgment on this threshold issue, LoopNet claims that the license agreements, or some of them, grant the licensees the right to publish the photographs on the internet.[3]

Maryland adheres to the law of objective interpretation of contracts and, thus, where the language is clear and unambiguous, the plain meaning is given effect and no further construction is needed.    The question of contract interpretation is one of law for the court.    *Auction & Estate Representatives, Inc. v. Ashton*, 731

---

[3] LoopNet has not identified which licensing agreements pertain to which alleged infringing photographs.    Accordingly, it would not be appropriate to grant it summary judgment on this issue, even were the court to find that any of the agreements contained a sufficient consent by CoStar to the internet use of the photographs.

A.2d 441, 444-45 (Md. 1999). LoopNet suggests that the following
language grants the licensee permission to upload photographs onto
its web site:

> Licensee may use the Database only for its
> internal market research purposes and to
> produce reports for Licensee's in-house use or
> for its clients in the course of Licensee's
> normal brokerage operations . . . ; provided
> however, that Licensee may not generally
> reproduce or republish all or substantial
> portions of the Database or Images, without
> the prior written consent of RIP [predecessor
> to CoStar], for any other purpose or in any
> other form . . .Licensee may not distribute
> any Image file in electronic format, except
> for use in presentation or marketing format
> for distribution to client.   Licensee is
> explicitly prohibited from publishing or
> posting CoStar data or compilations based upon
> CoStar data on, or providing access to CoStar
> via, the Internet, a public or private
> bulletin board system or other electronic
> network, without the express prior written
> permission of RIG.

Paper No. 87, at 13, ex. 18.

Assuming the quoted language is in a pertinent agreement,
LoopNet's strained interpretation depends on finding that the use
granted in the first sentence broadly grants the right to post the
photographs and then that the limitations on Internet use apply to
data, and not to images.  The contract language itself does not
support that interpretation.  There is no broad right to use any
portion of the database; rather, the licensee's use is restricted
to research, in house reports, and for clients.  There is no broad
right to use the database for wider, indiscriminate dissemination.

Thus, LoopNet's premise is lacking and it is not necessary to parse the remaining language.

2.  LoopNet's Conduct

CoStar asserts that LoopNet directly copies and distributes its photographs on its web site.  LoopNet contends, however, by relying on *Religious Tech. Center v. Netcom On-Line Communication Servs., Inc.*, 907 F.Supp. 1361 (N.D. Cal. 1995), that it cannot be liable for direct infringement absent "some element of volition or causation."  Paper 87 at 18.  LoopNet also argues that it does not "reproduce" CoStar's photographs on its web site, but rather only allows another to upload or download them.   Id.  at  23-24. Similarly, LoopNet challenges CoStar's contention that it directly distributes or displays the photographs.

In this case, as in *ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 621-22 (4th Cir. 2001), there is insufficient basis for a claim of direct infringement:

> ALS Scan contends first that the district court erred in dismissing its direct copyright infringement claim.   It contends that it stated a cause of action for copyright infringement when it alleged (1) the "ownership of valid copyrights," and (2) RemarQ's violation of its copyrights "by allowing its members access to newsgroups containing infringing material."  [FN1]  *See generally Keeler Brass Co. v. Continental Brass Co.*, 862 F.2d 1063, 1065 (4th Cir. 1988) (describing the requirements of a direct infringement claim).  In rejecting ALS Scan's direct infringement claim, the district court relied on the decision in *Religious Technology Center v. Netcom On-Line Communication*

9

*Services, Inc.*, 907 F.Supp. 1361, 1368-73 (N.D.Cal. 1995), which concluded that when an Internet provider serves, without human intervention, as a passive conduit for copyrighted material, it is not liable as a direct infringer. The *Netcom* court reasoned that "it does not make sense to adopt a rule that could lead to liability of countless parties whose role in the infringement is nothing more than setting up and operating a system that is necessary for the functioning of the Internet." *Id.* at 1372. That court observed that it would not be workable to hold "the entire Internet liable for activities that cannot reasonably be deterred." *Id.; see also Marobie-Fl, Inc. v. National Ass'n of Fire and Equipment Distributors*, 983 F.Supp. 1167, 1176-79 (N.D.Ill. 1997) (agreeing with *Netcom*'s reasoning). ALS Scan argues, however, that the better reasoned position, contrary to that held in *Netcom*, is presented in *Playboy Enterprises, Inc. v. Frena*, 839 F.Supp. 1552, 1555-59 (M.D.Fla. 1993), which held a computer bulletin board service provider liable for the copyright infringement when it failed to prevent the placement of plaintiff's copyrighted photographs in its system, despite any proof that the provider had any knowledge of the infringing activities.

FN1. It would appear that ALS Scan's allegations amount more to a claim of contributory infringement in which a defendant, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another," *Gershwin Pub. Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971), than to a claim of direct infringement.

In the 1995 *Netcom* decision, Judge Whyte applied pre-DMCA law to the operator of a computer bulletin board service, which gained access to the internet through Netcom, a large internet access

10

provider. The court was careful to distinguish between the system at issue there, where the copying of material was initiated by a third party, from that in *MAI Systems Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993), where the defendant itself initiated the creation of temporary copies. It was in that context that the court observed: "Although copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely used to create a copy by a third party." 907 F. Supp. at 1370.

In *ALS Scan*, 239 F.3d at 622, the Fourth Circuit resolved the dichotomy as follows:

> Although we find the *Netcom* court reasoning more persuasive, the ultimate conclusion on this point is controlled by Congress' codification of the *Netcom* principles in Title II of the DMCA. As the House Report for the Act states,
>
>> The bill distinguishes between direct infringement and secondary liability, treating each separately. This structure is consistent with evolving case law, and appropriate in light of the different legal bases for and policies behind the different forms of liability.
>>
>> As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another. Thus the bill essentially codifies the result in the leading and most thoughtful judicial decision to date: *Religious Technology Center v. Netcom On-Line Communications Services, Inc.*, 907

11

> F.Supp. 1361 (N.D.Cal. 1995). In
> doing so, it overrules these aspects
> of *Playboy Enterprises Inc. v.
> Frena*, 839 F.supp. 1552 (M.D. Fla.
> 1993), insofar as that case suggests
> that such acts by service providers
> could     constitute     direct
> infringement, and provides certainty
> that *Netcom* and its progeny, so far
> only a few district court cases,
> will be the law of the land.

H.R. Rep. No. 105-551(I), at 11 (1998).
Accordingly, we address only ALS Scan's claims
brought under the DMCA itself.

Thus, the Fourth Circuit found that Congress had decided the
issue, adopting the *Netcom* approach, which it found more persuasive
in any event. CoStar nevertheless continues to urge a finding of
direct infringement here, by pointing out that the version of the
DCMA actually enacted was NOT the one described in the referenced
House Report. Then, it urges the court to adopt the reasoning of
the *Playboy* line of cases instead.

The undersigned finds that this case does not present a valid
claim of direct copyright infringement. As observed by the Fourth
Circuit, the *Netcom* approach is more persuasive, even if not
mandated by the DCMA. Rather, contributory infringement is the
proper rubric under which to analyze the case.

B. Contributory Copyright Infringement

1. Overview

It is, today, a given that:

> "one who, with knowledge of the infringing
> activity, induces, causes or materially

12

> contributes to the infringing conduct of
> another, may be held liable as a
> 'contributory' infringer." *Gershwin Publ'g
> Corp. v. Columbia Artists Mgmt, Inc.*, 443 F.2d
> 1159, 1162 (2d Cir. 1971); *see also Fonovisa,
> Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264
> (9th Cir. 1996). Put differently, liability
> exists if the defendant engages in "personal
> conduct that encourages or assists the
> infringement." *Matthew Bender & Co. v. West
> Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998).

*A&M Records*, 239 F.3d at 1019.

CoStar argues that LoopNet is liable because of its own conduct in operating the system, and not merely because it made technology available that others might use to infringe. According to CoStar, once it gave notice of specific alleged infringements to LoopNet, LoopNet had knowledge of ongoing infringements by its users. CoStar asserts that this knowledge, coupled with the lack of more drastic measures to prevent infringement, constitutes inducement and so renders LoopNet liable for contributory infringement.

CoStar attempts to distinguish this case from *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), where the mere provision of means, capable of substantial noninfringing uses, was not a basis for contributory infringement. Instead, CoStar seeks to bring the current case under the analysis in *Fonovisa v. Cherry Auction*, 76 F.3d 259, 264 (9th Cir. 1996) (holding that the knowing provision of swap meet facilities necessary to the sale and distribution of infringing works was a "material contribution" to

13

the infringement of others) and *A&M Records v. Napster*, 239 F.3d 1004, 1020 (9th Cir. 2001)(distinguishing *Sony* on the basis of Napster's "actual, specific knowledge" of direct infringement).

The difference between *Sony*, in which the court found no contributory infringement, and *Fonovisa* and its ilk, where it did, is a matter of time frame and the retention of some control by the party providing facilities. In *Sony*, the only connection between Sony and the potential direct infringers was at the point of sale, after which Sony had no control over the use of its Betamax. In contrast, in *Fonovisa*, the operators of the swap meet not only rented the premises, but provided other facilities. Furthermore, they continued to retain control over the facilities and were in a position to deny access once they had actual knowledge of infringement. *Fonovisa*, 76 F.3d at 264.

The court in *Napster* picked up on this and found that Napster had actual knowledge of specific infringements by its users, *Napster*, 239 F.3d at 1020, whereas in *Sony*, it was a matter of imputing knowledge of possible infringements. Although fact issues precluded summary judgment on contributory infringement in *Netcom*, that case supports this characterization of the difference between *Fonovisa* and *Sony* because the court held that the time to assess infringement was when the services were provided, not when the parties entered into an agreement. *Netcom*, 907 F.Supp. at 1373, 1374. Thus, CoStar seeks to analogize LoopNet's role vis à vis the

14

infringements to that of the swap meet operator in *Fonovisa*, where ongoing services were provided and in which the operators had actual or constructive knowledge of direct infringements.

LoopNet, in turn, contends that is not liable for contributory infringement because (1) it had no knowledge of the infringement prior to notice from CoStar and (2) it has not induced, caused, or materially contributed to the infringing conduct of its users because it discontinued access to the infringing material immediately upon discovery. It asserts that its policy for removal of infringing material and of denying access to repeat infringers is sufficient to avoid liability because its conduct does not rise to the level of inducement.

In addition, LoopNet argues that, for any infringements occurring after December 8, 1999[4], it is protected from liability in damages for contributory infringement by the DMCA's safe harbor for online service providers (OSP's). The DMCA was enacted to strike a new balance between the viable operations of OSP's and the need to enforce copyright protection. It shields service providers from damages unless they have knowledge of infringement by users or

---

[4] The DMCA states: "The limitations on liability... apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3)." 17 U.S.C. 512(c)(2) (1998). It is undisputed that LoopNet did not designate an agent until December 8, 1999. Paper no. 96, at 33. Therefore, the safe harbor is only available to LoopNet with regard to its liability (if any) arising after that date.

15

are notified by copyright owners of alleged infringements.    The liability shield remains, however, only as long as the service provider follows the Act's "take down" provisions and expeditiously removes or blocks access to infringing (or allegedly infringing) material.    LoopNet contends that it is protected by the safe harbor, that it maintains an adequate policy for the termination of repeat offenders, and that, once notified by CoStar of alleged infringements, it complied sufficiently with the "take down" provisions to remain shielded from liability.  CoStar, on the other hand, maintains that LoopNet is not protected by the safe harbor and that, even if it is, its removal procedures do not satisfy the "take down" requirements for staying within the safe harbor once it has knowledge of actual or potential infringements.

CoStar does not claim that LoopNet had knowledge of its users' infringements prior to its giving notice.[5]  Paper no. 71, at 26. In *Netcom*, the court found that Netcom was unable to screen out the allegedly infringing postings before they were made and that there was a factual dispute over whether Netcom had knowledge apart from that gained when it received notice of specific infringements from the plaintiff.  *Netcom*, 907 F.Supp. at 1374.  Given the nature of

---

[5] LoopNet first received at least some notice of infringements from CoStar in the form of a letter on February 16, 1998.  Paper no. 1, at 7, ex. G.  CoStar refers in one brief to the first of its seven notices to LoopNet occurring on February 28, 1999.  Paper no. 71, at 26.  However, all other briefs and exhibits show no evidence of a February 28, 1999 notice, but prove the existence of the February 16, 1998 letter.

16

the infringements in this case, it was impossible for LoopNet to
have knowledge of the alleged infringement before receiving notice
from CoStar. CoStar does not attach a copyright notice to its
photos and even CoStar's own expert could not identify a CoStar
photo simply by reviewing it. Paper no. 87, at 26, Ex. 20.
Additionally, prior to receiving notice from CoStar, LoopNet did
not have knowledge about the status of CoStar's licensing
agreements with its clients. Although exceeding the scope of a
license constitutes copyright infringement (see Tasini v. New York
Times Co., 206 F.3d 161, 170 (2d Cir. 2000)), even if LoopNet
suspected that some photographs posted on its site were
copyrighted, as with the user's fair use claim in Netcom, there was
no way for LoopNet to know whether the copyright owners' licensing
agreements would allow the photographs to be used in such a way.
In the case of a service provider, knowledge giving rise to
liability only exists when there is no colorable claim of users'
noninfringment.   Netcom, 907 F.Supp. at 1374.   Thus, LoopNet
cannot be charged with any form of knowledge before receiving
claims of infringement from CoStar.

Although CoStar does not claim that LoopNet had knowledge of
infringement prior to receiving notice from CoStar, there remain
factual disputes about the type of knowledge with which it can be
charged after receiving the claims of infringement. CoStar alleges
that once it gave LoopNet notice that its photographs were being

17

infringed, LoopNet can be charged with knowledge of continuing infringements. Additionally, there is a dispute over whether LoopNet's policies to deter infringement, remove infringing works, and prevent repeat infringement were inadequate. CoStar claims that if, as it asserts, those policies were not adequate, LoopNet can be found to have induced or materially contributed to continuing infringements by its users of which, CoStar argues, it had knowledge.

The existence of the safe harbor convolutes the analysis of copyright infringement which, theoretically, should proceed in a straight line. Ideally, CoStar would have to make a *prima facie* showing that LoopNet was liable of contributory infringement and then the court would turn to the question of whether the "safe harbor" provided a defense. However, because the parameters of the liability protection provided by the "safe harbor" are not contiguous with the bounds of liability for contributory infringement, the analysis may proceed more efficiently if issues are decided a bit out of order. On summary judgment, it is often appropriate for a court to decide issues out of the traditional order because a dispute of fact is only material if it can affect the outcome of a proceeding. *Anderson*, 477 U.S. at 248. Thus, to the extent, if at all, that LoopNet is entitled to summary judgment in its safe harbor defense, all other issues concerning damages

18

liability for contributory infringement would be rendered immaterial.

2.  The Digital Millennium Copyright Act

The court now turns to its analysis of LoopNet's status under the DMCA and whether it remains in the safe harbor provided by that act with regard to damages for infringements occurring after December 8, 1999.

In 1998, Congress enacted the DMCA. Title II of the Act, the Online Copyright Infringement Liability Limitation Act, is codified at 17 U.S.C. § 512. It provides, in part, that:

(c) **Information residing on systems or networks at direction of users.**--

(1) **In general.**-A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider-

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of the facts or circumstances from which infringing activity is apparent;

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

19

> (C) upon notification of claimed infringement
> as described in paragraph (3), responds
> expeditiously to remove, or disable access to,
> the material that is claimed to be infringing
> or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1) (1998).  The service provider must also
designate an agent to receive notifications.  17 U.S.C. § 512(c)(2)
(1998).

As a relatively recently enacted statute, there is little
interpretative case law, although there is a growing body of
commentary and reports.  Amy P. Bunk, J.D., *Validity, Construction
and Application of Digital Millennium Copyright Act*, 2001 A.L.R.
Fed. 2 (2001) (unpublished annotation); see also Alfred C. Yen,
*Internet Service Provider Liability for Subscriber Copyright
Infringement, Enterprise Liability, and the First Amendment*, 88
Geo.L.J. 1833 (2000).  To the extent that the statutory language
may be unclear, the legislative history of the DMCA can be useful
in fleshing out its meaning given the paucity of precedent
interpreting the statute.  Congress has traditionally defined the
scope of copyright protections:

> Sound policy, as well as history, supports our
> consistent deference to Congress when major
> technological innovations alter the market for
> copyrighted materials.  Congress has the
> constitutional authority and the institutional
> ability to accommodate fully the varied
> permutations of competing interests that are
> inevitably complicated by such new technology.

*Sony*, 464 U.S. at 431.  In light of the courts' traditional
deference to Congress and the lack of precedent interpreting the

Digital Millennium Copyright Act, it is appropriate to turn to the
legislative history of that act, as well as precedent, in order to
define the relationship between contributory infringement and the
safe harbor provisions of the Act.

The Fourth Circuit has decided one case dealing with the
relationship of the DMCA and contributory infringement: *ALS Scan,*
239 F.3d at 625, *citing* H.R. Rep. No. 105-796, at 72 (1998):

> The DMCA was enacted both to preserve
> copyright enforcement in the Internet and to
> provide immunity to service providers from
> copyright infringement liability for
> "passive," "automatic" actions in which a
> service provider's system engages through a
> technological process initiated by another
> without the knowledge of the service provider.
> . . . The DMCA's protection of an innocent
> service provider disappears at the moment the
> service provider loses its innocence, i.e., at
> the moment it becomes aware that a third party
> is using its system to infringe. At that
> point, the Act shifts responsibility to the
> service provider to disable the infringing
> matter, "preserv[ing] the strong incentives
> for service providers and copyright owners to
> cooperate to detect and deal with copyright
> infringements that take place in the digital
> networked environment."

The DMCA seeks to strike a balance by shielding online service
providers from liability in damages as long as they remove or
prevent access to infringing material.[6]  The initial inquiry is

---

[6] CoStar makes an argument both here and when addressing the
issue of contributory infringement directly that LoopNet's use of
humans to check photographs as opposed to the mere use of an
automated process distinguishes it from the "technology" line of
cases, notably *Napster*. While CoStar is correct in that ongoing,
active control over the facilities used by infringers is the

21

whether LoopNet can be considered a service provider for the purposes of the DMCA.

a. Service Provider

In order to qualify for the safe harbor in the DMCA, LoopNet must meet the definition of "online service provider." Under § 512 (k)(1)(A), a service provider is "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A) (1998). For the other safe harbor provisions, including (c), which is at issue here, the definition is broader: "a provider of online services or network access, or the operator of facilities therefor." *Id.* at (B).

CoStar challenges LoopNet's ability to qualify as a service provider, contending that LoopNet is not a web page hosting service limited to the "provision of Internet infrastructure." Paper no. 96, at 12. LoopNet contends that it is a web page hosting service,

---

critical issue, whether the uploading process is controlled by technological or human barriers is irrelevant. LoopNet has people checking photographs for purposes other than copyright infringement (Paper no. 87, at 52) and CoStar's own experts could not distinguish between a CoStar and non-CoStar photograph upon inspection. *Id.* at 26, Ex. 20. Essentially, the difference between human or computer control does not change the calculus that LoopNet only had notice, if ever, when informed of alleged infringements by CoStar and that the existence of ongoing, active control is proven without reference to the human/technology dichotomy.

but also, more generally, that it falls within the Act's broad definition of "online service provider." Paper no. 87, at 35.

Statutory interpretation principles direct the court to consider, first, the plain language of the statute. If there is no ambiguity, then no resort to extrinsic aids is appropriate.[7]  A court must harmonize all portions of a statute, and not read any single provision out of context. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997), *citing Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 477 (1992).

It is not necessary to decide, at this time, just how far the definition of "online service provider" extends. CoStar turns to the legislative history of the DMCA for support for its proposed limitation of the term "online service provider," but that limitation is simply not commensurate with the language of the act. "The Act defines a service provider broadly." *ALS Scan*, 239 F.3d at 623.  In *ALS Scan*, neither party suggested that RemarQ was not a service provider under that definition. In another recent case, it was also undisputed that internet auction site eBay "clearly

---

[7] The parties concentrate on the legislative history which reports that the definition includes "providing Internet access, e-mail, chat room and web page hosting services." H.R. Rep. No. 105-551, at 64 (1998).  They then debate whether LoopNet provides webpage hosting services.

23

meets the DMCA's broad definition of online 'service provider.'"
*Hendrickson v. eBay Inc.*, -- F.Supp.2d -, No. CV 01-0495 RJK, 2001
WL 1078981, at *5 (C.D.Cal. Sept. 4, 2001). Therefore, it is
simply not possible to read the definition of service provider as
narrowly or as technically restrictive as CoStar would have it.
"Online services" is surely broad enough to encompass the type of
service provided by LoopNet that is at issue here. The term is, of
course, only a threshold to the protections of the Act. Even if
LoopNet qualifies as a service provider, it must meet the other
criteria.

        b.   Stored at the instance of the user

        A service provider is only protected from liability by the
DMCA, "for infringement of copyright by reason of its storage at
the direction of a user of material." 17 U.S.C. § 512(c)(1). The
legislative history indicates that this does not include material
"that resides on the system or network operated by or for the
service provider through its own acts or decisions and not at the
direction of a user." H.R. Rep. No. 105-551, at 53 (1998). CoStar
argues that photographs are uploaded to the site only after review
and selection by LoopNet and so they are not stored at the instance
of the user. However, that is a mischaracterization of the process
by which the photographs are uploaded. They are uploaded at the
volition of the user and are subject, not to a review and selection
process, but to a mere screening to assess whether they are

24

commercial property and to catch any obvious infringements. Paper no. 87, at 52. Although humans are involved rather than mere technology, they serve only as a gateway and are not involved in a selection process. *See supra* note 6.

The ability to remove or block access to materials cannot mean that those materials are not stored at the user's discretion or it would render the DMCA internally illogical. The "take down" procedures of § 512 mandate that the service provider remove or block access to materials in order to stay in the safe harbor. It would be inconsistent, then, if in order to get into the safe harbor, the provider needed to lack the control to remove or block access. *See Hendrickson*, 2001 WL 1078981 at *9 (making analogous argument regarding the standard for direct financial benefit in § 512(c)(1)(B)), *see also infra* note 9. Therefore, this threshold requirement is met and LoopNet is not disqualified from the safe harbor on these grounds.

c. Knowledge

The safe harbor protects service providers from liability unless they have knowledge of copyright infringement. There are three types of knowledge of infringement that can take a service provider out of the safe harbor: (1) the service provider can have actual knowledge of infringement; (2) it can be aware of facts which raise a "red flag" that its users are infringing; or (3) the copyright owner can notify the service provider in a manner

25

"substantially" conforming with § 512 (c)(3) that its works are being infringed. See H.R. Rep. No. 105-551, Part 2, at 53 (describing the "red flag" test). The service provider does not automatically lose its liability shield upon receiving notice, but "the Act shifts responsibility to the service provider to disable the infringing matter..." ALS Scan, 239 F.3d at 625.

The question at this stage of the analysis is whether LoopNet had sufficient knowledge of its users' copyright infringement to trigger the "take down" provisions of the DMCA. If sufficient knowledge is established, then the analysis shifts to whether LoopNet complied with the language of the DMCA's "take down" provisions. Although different DMCA sub-sections control "take down" procedures for actual or "red flag" knowledge than those necessitated when the service provider receives notification of a claimed infringement,[8] the language of both sub-sections is the same: whether the service provider acted, "expeditiously to remove, or disable access to, the material," so as to stay in the safe harbor. 17 U.S.C. § 512 (c)(1)(A)(iii) or § 512 (c)(1)(C). If LoopNet did not adequately remove or block access to the claimed infringing material, it loses its DMCA liability shield, but is not

_____

[8] If the service provider has actual knowledge under § 512(c)(1)(A)(i) or "red flag" knowledge under § 512(c)(1)(A)(ii), the "take down" provisions of § 512(c)(1)(A)(iii) must be met to stay in the safe harbor. Alternatively, if it receives notification of claimed infringement in accordance with §512(c)(3), the "take down" provisions of § 512(c)(1)(C) must be met.

necessarily liable for contributory infringement. As will be seen, proof that LoopNet had knowledge of and induced the infringements are necessary elements of CoStar's contributory infringement claim. These elements are slightly different from those applicable to LoopNet's safe harbor defense and so require a separate determination if LoopNet fails to remain in the safe harbor.

LoopNet has not challenged the sufficiency of CoStar's notification of claimed infringement. Furthermore, under Fourth Circuit law, notice is adequate to trigger the safe harbor "take down" protocols when it "substantially complies with the notification requirements" of § 512(c)(3)(A). *ALS Scan*, 239 F.3d at 625. Therefore, LoopNet received notification of claimed infringement that complies with § 512(c)(3)(A) and so the adequacy of LoopNet's removal policy must be assessed to determine whether LoopNet is protected by the safe harbor.

d. Adequacy of Termination and "Take Down" Policy

Once a service provider has received notification of a claimed infringement as described in § 512(c)(3), the service provider can remain in the safe harbor if it "responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity." 17 U.S.C. § 512(c)(1)(C) (1998). CoStar claims that LoopNet has not acted expeditiously or effectively in removing infringing material once it has received notification and so has not satisfied §

27

512(c)(1)(C). Furthermore, there is a related, though not identical, requirement that limitations on liability only apply to a service provider if that provider:

> has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C § 512(i)(1)(A) (1998). This requirement is designed so that flagrant repeat infringers, who "abuse their access to the Internet through disrespect for the intellectual property rights of others should know there is a realistic threat of losing...access." H.R. Rep. No. 105-551, Part 2, at 61. CoStar argues that LoopNet has not adopted and reasonably implemented a policy and so should lose its liability shield according to § 512(i)(1). Although the satisfaction of each of these provisions have different requirements, they each turn on similar factual determinations. With respect to each, there are material factual disputes that preclude summary judgment.

In making its claim that LoopNet's "take down" of infringing material following notification was inadequate, CoStar points to LoopNet's failure to remove several photographs after being notified by CoStar that they were infringing and claims that several photographs have been posted more than once after notification. Paper no. 96, at 34. In attacking LoopNet's

28

termination policy for repeat infringers, CoStar asserts that there is no evidence that LoopNet has ever terminated any user's access despite the fact that some of them have an extensive history as repeat infringers. Paper no. 70, at 29, 20, ex.5, 23.

LoopNet argues in contrast that § 512(i)(1)(A) does not require that it terminate access, but that it reasonably implement a policy for termination of repeat infringers in appropriate circumstances. Paper no. 87, at 45. LoopNet's policy includes "Terms and Conditions" that include the removal of listings alleged to have infringed copyrights, the possibility of additional evidence demonstrating compliance with the noninfringement policy for repeat infringers, and the possibility of termination. Id. at 45, ex. 7. In addition, LoopNet claims that it promptly removes photographs once it receives notice of alleged infringement, sends an e-mail to brokers explaining the potential consequences of repeat infringement and investigates brokers it suspects to be repeat infringers. Id. at 46, ex.16, 2, 3. Specifically, LoopNet challenges the designation by CoStar of certain brokers as repeat infringers and claims that it has limited the access of some brokers. Id. at 47-49, ex. 2, 3, 24. Finally, LoopNet counters CoStar's assertion that it has not acted expeditiously to remove allegedly infringing photographs in compliance with § 512(c)(1)(C) when it receives notice and claims to have implemented additional

precautions to avoid reposting of infringing photographs in the future. *Id.* at 56, ex. 2.

There are several material factual disputes remaining as to whether the removal of allegedly infringing photographs was satisfactorily expeditious and whether LoopNet's termination policy was reasonable and effective. CoStar's infringement claims are based on the posting of specific photographs. Additionally, LoopNet's knowledge of the alleged infringements and its "take down" and termination policies have changed over time in fairly significant ways. In order to resolve this issue, the factfinder will have to focus on each photo and the policy in effect prior to the posting of each photo. Hence, neither party is entitled to summary judgment on this issue.

e.  Direct financial benefit

CoStar argues that LoopNet does not qualify for the safe harbor because it obtains a direct financial benefit from the infringing photographs that appear on its website. Paper no. 96, at 30.  Regardless of whether LoopNet complied with the "take down" requirements, a finding that it received a direct financial benefit from the infringement automatically would remove it from the safe harbor. To stay in the safe harbor, LoopNet has to show that it "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. §

512(c)(1)(B) (1998). Basically, the DMCA provides no safe harbor for vicarious infringement because it codifies both elements of vicarious liability.   3 Melville B. Nimmer and David Nimmer, Nimmmer on Copyright, §12B.04[A][2], at 12B-38 (2001).

LoopNet meets neither element of this test.  CoStar does not assert that LoopNet has any right to control its users beyond merely the ability to control or block access to its site.   As such, LoopNet does not have the "right and ability" to control its users commensurate with the standard for vicarious infringement. "[T]he 'right and ability to control' the infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored in its system." Hendrickson, 2001 WL 1078981 at *9.[9]

Furthermore, LoopNet does not meet the other element for direct financial benefit.   LoopNet does not charge a fee for posting any real estate listing, with or without a photograph. While CoStar correctly asserts that the legislative history of the DMCA supports the use of a common-sense rather than a formalistic

---

[9] A finding that the "right and ability to control" standard could be met merely by the ability to remove or block access to materials would render the DMCA internally inconsistent.   The result would be that the very policy mandated by the DMCA in § 512(c)(1)(C) to remain in the safe harbor, terminating infringers and blocking access, would force service providers to lose their immunity by violating §512(c)(1)(B). See Hendrickson, 2001 WL 1078981, at *9.

31

approach, that same Senate Report stated that it would not be a considered a direct financial benefit "where the infringer makes the same kind of payment as non-infringing users of the provider's service." H.R. Rep. No. 105-551, Part 2, at 54. In this case, neither infringing or non-infringing users made any kind of payment.

CoStar attempts to bolster its argument for a broader conception of benefit by relying on *Playboy Ent. v. Russ Hardenburgh, Inc.*, 982 F.Supp. 503 (N.D.Oh. 1997). In that case, the defendant operator of an electronic bulletin board (BBS) was found liable for contributory infringement when it encouraged subscribers to upload photographs and benefitted indirectly from having more files available to customers. *Hardenburgh* was based in part on *Fonovisa*, in which "contributory liability could attach where 'infringing performances enhance the attractiveness of the venue to potential customers.'" *Hardenburgh*, 982 F.Supp. at 514, *citing Fonovisa*, 76 F.3d at 263. However, that assessment of a benefit to the defendant was not for the purposes of § 512(c)(1)(B) of the DMCA, but rather was a part of the court's determination that the defendant met the standard for contributory infringement. Both the language and the purpose of the test for direct financial benefit are different from the test for contributory infringement. Whereas in *Playboy* and *Fonovisa*, the finding of added value to the defendant was evidence that the defendant induced the infringement,

32

for the purposes of the DMCA, the financial benefit must be "directly attributable to the infringing activity." 17 U.S.C. § 512(c)(1)(B) (1998). CoStar might make an argument that the indirect type of benefit cited in *Hardenburgh* is also present here. However, such a benefit does not fit within the plain language of the statute. Accordingly, § 512(c)(1)(B) does not present a barrier to LoopNet remaining in the safe harbor.

3. Liability for Contributory Infringement

With regard to the photographs that were infringed before the safe harbor applied,[10] and in case LoopNet's termination policy and take down of infringing photographs is found to be inadequate so as to remove it from the safe harbor, the analysis shifts from the DMCA back to contributory infringement. The determination of contributory infringement liability turns on a different issue of knowledge than the standard used to determine LoopNet's eligibility for the safe harbor. Here, the question is whether CoStar's notice of claimed infringement was sufficient to satisfy the knowledge prong of the test for contributory infringement either by providing

―――――――――――――――

[10] It is undisputed that "LoopNet does not claim immunity for damages prior to LoopNet's registration under the DMCA." Paper no. 87, at 35 n. 20. CoStar identifies 179 photographs that fall in that category of photographs identified before safe harbor took effect. Paper. No. 96, at 33. However, CoStar does not claim that LoopNet is liable for the contributory infringement of its photographs before it sent the first notification of alleged infringement to LoopNet on February 16, 1998. Paper no. 1, at 7. The issues of liability addressed in this section pertain to those photographs that were alleged to be infringed between that first notice and the safe harbor.

33

actual knowledge, a "red flag" that infringement was occurring, or constructive knowledge. Additionally, to prevail on its claim for contributory infringement, CoStar must prove that LoopNet induced, caused or materially contributed to the infringement. *Gershwin*, 443 F.2d at 1162.

It is necessary to assess this claim along two dimensions. The first is whether notice by CoStar to LoopNet satisfies the knowledge prong of the test for contributory infringement. More specifically, there are questions as to the scope of the notice given and the corresponding scope of knowledge. CoStar alleges that once it gave LoopNet notice of specific infringements, LoopNet was on notice that ongoing infringements were occurring and had a duty to prevent repeat infringements. LoopNet does not deny that it was on notice that specific photographs were allegedly infringed, but asserts that it cannot be charged with imputed knowledge of future infringements. This first dimension of knowledge flows into the second assessment, determining whether inducement occurred. There is a critical interplay between the level of knowledge possessed by LoopNet as a result of CoStar's notices and the amount of policing, deterrence and removal demanded of LoopNet to avoid being liable for contributory infringement. If CoStar's notice to LoopNet gave LoopNet a broad scope of knowledge that infringements were occurring, then it creates a high level of policing necessary by LoopNet to avoid inducing infringement.

34

The issue of the adequacy of LoopNet's removal policy is different at this stage than it was when assessing its adequacy for the purposes of the DMCA safe harbor. In the safe harbor context, the removal policy had adequately to remove infringing or allegedly infringing material. If LoopNet met the standard following notice it was shielded from damages liability by the safe harbor. In the context of assessing liability for contributory infringement, the question is not whether LoopNet adequately removed the infringing material, but whether, at some point, it created an inducement to put infringing material up on the site. CoStar argues that the fact that it gave LoopNet notice meant that when LoopNet, as it alleges, did not adequately police infringement and create disincentives to infringing, it actually induced the infringing. Therefore, it argues, LoopNet is liable because it had knowledge of infringement and induced the infringers to use its site. *See* *Gershwin*, 443 F.2d at 1162.

While liability for contributory infringement can be based on "merely providing the means for infringement," *Fonovisa*, 76 F.3d at 264, *citing* 2 William F. Patry, Copyright Law & Practice 1147, merely providing means is not always sufficient to prove infringement. CoStar is correct that its claims for contributory infringement against LoopNet are not analogous to *Sony*, in which the court found that the mere provision of means was an insufficient basis for contributory infringement when those means

were capable of substantial noninfringing use. In *Sony*, the only connection between Sony and the direct infringers was at the point of sale; Sony retained no access control similar to that of a service provider. Furthermore, the Betamax buyers were capable of potential infringements, but, at the time of the sale, Sony could not have notice of any actual infringements because they did not yet exist. In the current case, unlike *Sony*, LoopNet maintained control over access to the site and could deny access or block materials after gaining knowledge of infringement. It is unclear, however, when and to what extent LoopNet gained knowledge of infringement.

Instead, CoStar seeks to draw comparisons between the current case and *Fonovisa*, in which the owner of a swap meet who provided support services and took rental payments materially contributed to the underlying infringing activity. There was no question in that case that the swap meet owner had actual knowledge of the infringements. *Fonovisa* differs from *Sony* in the time frame involved; the owner had continued control over access to the swap meet, provided ongoing support through the use of facilities and knew of actual infringements, but did not block access. *See Fonovisa*, 76 F.3d at 264. CoStar also draws comparisons between the current case and *Sega Enters. Ltd. v Maphia*, 948 F.Supp. 923 (N.D.Cal. 1996). In *Sega*, the operator of a BBS was found liable for contributory infringement of copyrighted video games when he

36

knew users were uploading and copying games, provided the site and facilities for the infringing conduct, actively solicited users to upload games and highlighted the location of unauthorized games on his site. *Sega, 948 F.Supp.* at 933.

While LoopNet's continued control over access to its site is more similar to that of the BBS operator in *Sega* or the swap meet owner in *Fonovisa* than to the mere seller of goods in *Sony*, there are elements of knowledge in those cases which the court is not satisfied have been proven here. The current case seems more factually similar to *Netcom*, in which the court held that when a BBS operator could not "reasonably verify a claim of infringement" because it was beyond the ability of a BBS operator quickly and fairly to determine the validity of the user's fair use claim, the operator's lack of knowledge was reasonable. *Netcom*, 907 F.Supp. at 1374. In *Netcom*, the court found that a triable issue of fact existed with respect to the degree of knowledge Netcom possessed about its subscriber's infringement where the subscriber had "at least a colorable claim" of noninfringement. *Netcom*, 907 F.Supp. 1374. As in *Netcom*, the situation in the current case resides in that gray middle range of cases in which the service provider has information suggesting, but not conclusively demonstrating, that subscribers committed infringement. *See* Yen, *supra*, at 1875 (stating that *Netcom* holds that knowledge is necessary for contributory liability).

37

In the analysis of LoopNet's safe harbor defense to liability, mere notification of claimed infringement by CoStar was enough to trigger one of two scenarios. Either LoopNet could comply with the "take-down" provisions of the DMCA and remain in the safe harbor or refuse to remove the allegedly infringing material and expose itself to the choppier waters of contributory infringement liability. However, that notification did not automatically equate to knowledge for the purpose of assessing liability. *Netcom* stands for the proposition that the bare claim of infringement by a copyright holder does not necessarily give rise to knowledge of an infringement.

CoStar needs to prove not only that LoopNet had knowledge of the infringements by its users, but that, as it asserts, LoopNet's alleged failure effectively to remove infringing photographs and dissuade infringers at some point began to comprise inducement or material contribution. In *Hardenburgh* and *Sega*, BBS operators not only had actual knowledge of its users' infringement, but encouraged subscribers to upload infringing works. While *Napster* and *Fonovisa* did not require actual encouragement of infringement, in both cases the defendant had actual, specific knowledge of infringements and continued to provide support and facilities to infringers. Thus, in order to prove its claim, CoStar needs to establish that the notice it gave to LoopNet comprised at least constructive knowledge of specific infringing activity which

38

LoopNet materially contributed to or induced by its alleged failure
to halt the activity.  There remain too many material factual
disputes for the court to decide on summary judgment either that
such a level of knowledge did or did not exist or that LoopNet's
actions in trying to stop the infringement were or were not
insufficient to the point of comprising inducement as a matter of
law.  Again, CoStar has alleged the infringement of specific
photographs posted at different times.  Over the same time,
LoopNet's knowledge of the alleged infringements and policies
regarding removal and termination have shifted significantly.  As
a result, the factfinder must determine along a continuum the
adequacy of the policy in place prior to the posting of each
specific photograph.  Therefore, neither party is entitled to
summary judgment on this issue.

## C.  Misuse

LoopNet argues that CoStar misused its copyrights by extending
them beyond their intended reach to limit its licensees from
distributing the entire database, including data and photographs in
which it has no copyright. Paper no. 87, at 31, 32.  Misuse of
copyright is an affirmative defense to a claim of copyright
infringement. The misuse defense, which is rarely asserted, stems
from an analogous misuse of patent defense recognized by the
Supreme Court in *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488
(1942), and was adapted to copyright in *Lasercomb America, Inc. v.*

39

*Reynolds*, 911 F.2d 970, 973-74 (4th Cir. 1990). Basically, this defense is an assertion that the copyright holder is using his copyright, "to secure an exclusive right or limited monopoly not granted by the [Copyright] Office and which it is contrary to public policy to grant." *Id.* at 977, *citing Morton Salt*, 314 U.S. at 492.

Although misuse is a claim of anticompetitive behavior, *Lasercomb* distinguished misuse from an antitrust violation when it held that:

> a misuse need not be a violation of antitrust law in order to comprise an equitable defense to an infringement action. The question is not whether the copyright is being used in a manner violative of antitrust law . . . but whether the copyright is being used in a manner violative of the public policy embodied in the grant of a copyright.

*Lasercomb*, 911 F.2d at 978. In *Lasercomb*, the Fourth Circuit examined plaintiff's use of anticompetitive language in its licensing agreements to determine whether the language was adverse to the public policy embodied in copyright law. It found that "[t]he misuse arises from Lasercomb's attempt to use its copyright in a particular expression, the Interact software, to control competition in an area outside the copyright, *i.e.*, the idea of computer-assisted die manufacture, regardless of whether such conduct amounts to an antitrust violation." *Id.* at 979. Despite the fact that conduct need not rise to the level of an antitrust violation to constitute misuse, the Fourth Circuit has been

hesitant to find misuse. For example, in *Service & Training, Inc. v. Data General Corp.*, 963 F.2d 680, 690 (4th Cir. 1992), the court rejected the appellant's effort to establish copyright misuse where appellant failed to establish that appellee did anything more than limit the use of its software to the repair and maintenance of specific computer hardware. Such activity, it held, was protected as an exclusive right of a copyright owner.

The gravamen of LoopNet's misuse claim is that CoStar seeks to restrict licensees from distributing photographs and data over which, by its own admission, it has no claim of ownership. Paper no. 87, at 32. However, this case bears little similarity to *Lasercomb*, where the software licensing agreement in question precluded the development of even non-infringing software. The establishment of this defense depends on a determination that the holder of a copyright is using that copyright in an anticompetitive manner against the public policy behind copyright. One case relied upon by LoopNet, *QAD, Inc. v. ALN Assocs., Inc.*, 770 F.Supp 1261 (N.D. Ill. 1991), demonstrates that the misuse defense is only applied in situations that are sufficiently abusive of copyright's grant of exclusivity.

LoopNet seeks to compare CoStar's use of its licensing agreement to the plaintiff's attempt in *QAD* to restrain the defendant's use of material over which it held no copyright. In that case, however, the plaintiff deceived the court over the

41

copyrighted and uncopyrighted elements of its software and, "further used that confusion to wield the heavy sword of litigation under the guise of legitimate copyright enforcement in areas in which it had no rights." Id. at 1267, n. 17. In this case, there is no allegation that CoStar has misled the court over the scope of its copyrights. Furthermore, there is no allegation of tying or abuse of copyright serious enough to offend the public policy behind copyright and rise to the level of misuse. Accordingly, LoopNet's defense of copyright misuse is rejected.

## D. Statutory Damages

LoopNet contends that, even if CoStar can establish infringement, it may, as a matter of law, recover no more than 11 statutory damage awards, corresponding to each of the then 11 (now 13) copyright registrations on which CoStar registered its photograph copyrights. Paper no. 87, at 62, 63. In contrast, CoStar contends that each of its 348 photographs constitutes a separate work and, therefore, it is entitled to 348 separate statutory damage awards should the court find infringement. Paper no 94, at 25. 17 U.S.C. § 504 (c)(1) states, in relevant part:

> the copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually... in a sum of not less than $500 or more than $20,000, as the court considers just. For the purposes of this subsection, all the parts of a

42

> compilation or derivative work constitute one
> work.

17 U.S.C. § 504 (c)(1) (1996). Each side agrees that the number of statutory damage awards should be determined on summary judgment, so both parties have moved for summary judgment on this issue.

The court's determination of the correct number of statutory damage awards will depend on what constitutes a "work" for the purposes of § 504 (c)(1) and, more particularly, on whether CoStar registered its photographs as a compilation or as separate works on the same registration. There appears to be a division of authority over whether the copyright registration is determinative of the number of works or whether the determinative factor is whether each work is independently copyrightable. However, this division can be reconciled by looking beyond the language used by the courts to the actual result in each case.

LoopNet seeks to establish that the number of registration certificates should be determinative of the number of statutory damage awards. In *Phillips v. Kidsoft*, 52 U.S.P.Q.2d 1102, 1106-07 (D.Md. 1999), a recent case in this district, the court held that the plaintiff was entitled only to 5 statutory damage awards for each registered maze book as opposed to 30 awards for each separate maze. That case seems to support the proposition that the copyright registrations were dispositive of the issue of statutory damage awards. The *Phillips* court appeared to disregard the economic viability test articulated in *Walt Disney Co. v. Powell,*

43

897 F.2d 565, 569 (D.C. Cir. 1990), and *Gamma Audio & Video, Inc. v. Ean-Chea*, 11 F.3d 1106, 1116 (1ˢᵗ Cir. 1993), and said, "In this case, whether or not the mazes copied by Kidsoft possess separate economic value is irrelevant because they are not individually copyrighted." *Phillips,* 52 U.S.P.Q.2d at 1106. This seems to place the onus on the number of copyrights registered to determine the number of statutory damage awards.

The court in *Stokes Seeds Ltd. v. Geo. W. Park Seed Co.,* 783 F.Supp. 104, 107 (W.D.N.Y. 1991), seems to take the same approach in holding that the plaintiff could get only a single statutory damage award for a book of photographs. The photographs constitute only one work, even though the photographs were separately copyrightable, because they were assembled into a collective whole and registered as a compilation. As in *Phillips*, the *Stokes Seed* court seems to look only to the number of registrations and eschews the "independent copyright life" test. *Id.; see also Xoom, Inc. v. Imageline, Inc.*, 93 F.Supp. 2d 688, 693 (E.D.Va. 1999) (holding that for a compilation or derivative work, "there should be only one award of statutory damages per registration.")

However, other courts have just as clearly recognized that multiple copyrights may be registered on the same form and, so, the registration is not dispositive. CoStar looks to authority which establishes an economic viability test for determining what constitutes a "work" for the purposes of statutory damages. In

44

*Gamma Audio,* 11 F.3d at 1116, the First Circuit stated that "separate copyrights are not distinct 'works' unless they can 'live their own copyright life.'" (internal citations omitted). Further, the court stated:

> Under regulations promulgated by the Copyright
> Office, the copyrights in multiple works may
> be registered on a single form, and thus
> considered one work for the purposes of
> registration, see C.F. R. §202.3(b)(3)(A),
> while still qualifying as separate "works" for
> the purposes of awarding statutory damages.
> We are unable to find any language in either
> the statute or the corresponding regulations
> that precludes a copyright owner from
> registering the copyrights in multiple works
> on a single registration form while still
> collecting an award of statutory damages for
> the infringement of each work's copyright."

*Gamma Audio*, 11 F.3d at 1117 (internal citations omitted).

In another case, *Playboy Enters., Inc. v. Sanfilippo*, 46 U.S.P.Q.2d (BNA) 1350 (1998), the court cited three main factors in its decision that each photograph should be considered a separate work for statutory damages: (1) each photograph had independent economic value and was viable on its own (as evidenced by licensing agreements for the redistribution of individual photographs subsequent to publication as a group in the magazine); (2) each photograph represents a singular and copyrightable effort concerning a particular model, photographer, and location; and (3) the defendant marketed each image separately on his web site. *Id.* at 1354-1356.   The economic value of the work has also been determinative in the Eleventh Circuit, which held that whether a

work is distinct is determined by whether each unit would have "independent economic value." *MCA Television Ltd. v. Feltner*, 89 F.3d 766, 769 (11th Cir. 1996).

Although these courts use language that makes them seem at odds, the approach has actually been consistent and so provides a clear guide for the current case. In cases like *Phillips* where each "work" was considered one registration, the plaintiff had actually registered a compilation, not separate copyrights on the same form. Therefore, even though the court in that case said the fact of the single registration obviated the need to assess the independent viability of each maze, the crucial fact was not the single registration, but the nature of what was registered. The photographs in *Sanfillipo* and the video tapes in *Gamma Audio* were never registered as compilations while the maze book in *Phillips* and the seed books in *Stokes Seeds* were. The critical fact, then, is not that CoStar registered multiple photographs on the same registration form, but whether it registered them as compilations or as individual copyrights.

The court, then, must look at how CoStar registered the photographs to determine whether they are separate works. CoStar asserts that it "has consistently registered the photographs collectively (that is, as a group) separately from the compilation." Paper no. 94, at 26, 27. It asserts that it is irrelevant that the photographs were registered together with

46

compilations because they were not a "part of the compilation" and, thus, should be considered separate works like the photographs in *Gamma Audio*. *Id.* at 27. However, it would stretch the bounds of credulity to read the evidence CoStar supplies as supporting its claim that the photographs are registered separately from the compilation.

While CoStar claims it makes a separate reference to the photographs in addition to its registration of the database compilation (see Paper no. 94, at 26), the language on the registration under "Nature of Authorship" on all but the first registration reads, "REVISED COMPILATION OF DATABASE INFORMATION; SOME ORIGINAL TEXT AND PHOTOGRAPHS." Paper no. 94, Ex. H. This same language is repeated when the form asks the registrant to give a brief, general statement of the material added to the work. On those same forms, where the registrant is asked to identify any previous works that the current work is based on or incorporates, the registration reads only, "previously registered database." *Id.* The registration makes no mention of the number or any specific features of the photographs it claims it sought to register. If CoStar registered these photographs without any other reference or description, as it claims to have done, it theoretically could have registered any number of photographs on those registrations. The bare reference to "photographs" only has efficacy as a description of the work to be copyrighted if it was made with reference to the

47

other elements being copyrighted — the compilation of work.   In other words, without the presence of the compilation as a limiting feature providing explication of which photographs CoStar sought to include in the registration, the word "photographs" is inadequate to describe the works to be registered.

CoStar refers to the slightly different language in its April 17, 1998, registration to support its assertion that it made separate mention of the photographs apart from the compilation. CoStar's registration does differ from its later registrations stating under "Nature of Authorship" that it is copyrighting "Compilation, text, and photographs."    Id.    On that same registration, when asked to describe briefly the work to be copyrighted, CoStar stated, "Compilation of public domain material, substantial original text, and original photographs."    Id. Admittedly, there is some ambiguity resulting from the placement of punctuation.    For example, there could plausibly be some significance to the difference between having a comma separate the word "compilation" from the words "text" and "photographs" on the April 17, 1998 registration as opposed to the semicolon it used in later registrations.    Additionally, it is not entirely clear whether CoStar meant to describe the work as a compilation of the material, text and photographs or, as it seeks to argue, a compilation of material and also text and photographs.   However, these arguments are not sufficient where CoStar makes no mention of

48

the numbers of separate photographs it meant to register on each application. For the reasons stated above, an interpretation of the registrations in which CoStar registered "photographs" without further explication makes no sense and is rejected.

CoStar seeks to bolster its interpretation of the language on the registrations by pointing to a letter from the Copyright Office which, it claims, "specifically recognized that CoStar is registering its compilation, photographs, and text collectively." Paper no. 94, at 27. CoStar is incorrect. The letter refers only to a copyright application for a "database" and authorizes "special relief" from the requirement that a complete database be filed with the Library of Congress so that CoStar could file a single registration for "a group of updates." Paper no. 94, Ex. I. No mention is made of text or photographs in the latter and the only reference to any collective registration is to the "group of updates." CoStar has not provided sufficient evidence that it registered copyrights for the photographs on the registration forms separate from its database compilations. Therefore, the court finds that CoStar registered only a compilation on each form.

As in Phillips, 52 U.S.P.Q.2d at 1106, it is irrelevant whether the photographs have independent economic value because they have not been separately registered, but registered only as the components of a compilation. Accordingly, CoStar will only be eligible for 13 statutory damage awards, corresponding to the

49

number of registered compilations, if LoopNet is found to have infringed on CoStar's copyright.

## E. Preemption of Non-Copyright Claims

LoopNet asserts that the Copyright Act preempts CoStar's non-copyright claims for reverse passing off, false designation of origin, unfair competition under federal and state law, intentional interference with business relations, and unjust enrichment under common law. Paper no. 87, at 61. The Copyright Act preempts state law that is "equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106." 17 U.S.C. § 301(a) (1996). "The Fourth Circuit Court of Appeals has interpreted the 'equivalency' test to mean that state law claims involving an act that would infringe rights under the Copyright Act are preempted unless they are 'qualitatively different.'" *Wharton v. Columbia Pictures Indus., Inc.*, 907 F.Supp. 144, 145 (D.Md. 1995), *citing Roscizewski v. Arete Associates, Inc.*, 1 F.3d 225, 230 (4th Cir. 1993). LoopNet argues that since the gravamen of CoStar's complaint is that LoopNet violated CoStar's exclusive right to reproduce, distribute, and display its copyrighted materials, this court should follow the court in *Wharton* which held that claims were "equivalent" when they concerned the "central allegation" of copyright infringement. Paper no. 87, at 62, citing 17 U.S.C. §106 and *Wharton*, 907 F.Supp. at 146.

50

As a preliminary matter, LoopNet's argument that the Lanham Act claims are preempted, Paper no. 87, at 61, is without merit. Section 301(d) of Title 17 states: "Nothing in this title annuls or limits any right or remedies under any other Federal statute." Thus, the Copyright Act, by its terms, does not preempt plaintiff's Lanham Act claims. *See Tracy v. Skate Key, Inc.*, 697 F.Supp. 748 (S.D.N.Y. 1988); *see also D.C. Comics, Inc. v. Filmation Assoc.*, 486 F.Supp. 1273, 1277 (S.D.N.Y.1980); 1 Melville B. Nimmer and David Nimmer, Nimmer on Copyright §1.01[D], at 1-66.6 (2001) ("[T]he current Copyright Act does not in any manner repeal or otherwise affect other federal statutes.").

"To determine whether a state claim is preempted by the Act, courts must make a two-part inquiry: (1) the work must be within the scope of the subject matter of copyright, and (2) the state law rights must be equivalent to any exclusive rights within the scope of federal copyright." *Fischer v. Viacom Intern. Corp.*, 115 F.Supp.2d 535, 540 (D.Md. 2000) (internal citation omitted). The scope of the subject matter of copyright encompasses "original works of authorship fixed in any tangible medium of expression" including literary, pictorial, and audiovisual works. 17 U.S.C. § 102(a) (1996). The first prong of this test is met since all of Plaintiff's claims involve the alleged infringement of its photographs, and photographs are pictoral works fixed in a tangible medium and so, within the scope of the subject matter of copyright.

51

"The second prong of the preemption inquiry requires a court to examine the rights a plaintiff claims under state law to determine whether these rights are equivalent to the exclusive rights granted by the Copyright Act." *Fischer*, 115 F.Supp.2d at 541. In order to demonstrate that the claims are not equivalent and "[t]o avoid preemption, a cause of action defined by state law must incorporate elements beyond those necessary to prove copyright infringement, and must regulate conduct qualitatively different from the conduct governed by federal copyright law." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 659 (4th Cir. 1993).

CoStar asserts that its state law claims meet the burden of being "qualitatively different" from the copyright claims because they include elements not found in the copyright claims. Paper no. 94, at 35, *citing Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 574 (4th Cir. 1994). In both *Avtec* and *Trandes*, defendants' claims that § 301 of the Copyright Act preempted trade secret claims failed because recovery for trade secret misappropriation requires proof of breach of confidence, which is an additional element of proof beyond those necessary to recover for copyright infringement. *See Avtec*, 21 F.3d at 574; *see also Trandes*, 996 F.2d at 660.

However, similar additional elements are not found in CoStar's common law unfair competition claims. The *Trandes* court distinguished the trade secret violation from a copyright infringement claim by holding that it was "the employment of

52

improper means to procure the trade secret, rather than the mere copying or use, which is the basis of [liability]." *Trandes*, 966 F.2d at 660 (emphasis omitted), *citing* Restatement (First) of Torts §757 cmt. A (1939). The distinction between those unfair competition claims that are not preempted and those that are is that "claims based upon breaches of confidential relationships, breaches of fiduciary duty and trade secrets have been held to satisfy the extra-element test," *American Movie Classics Co. v. Turner Entm't Co.*, 922 F.Supp. 926, 933 (S.D.N.Y. 1996), *citing Kregos v. Associated Press*, 3 F.3d 656, 666 (2d Cir. 1993), whereas claims of misappropriation and unfair competition based solely on the copying of the plaintiff's protected expression fail that test. The critical question, then, is whether CoStar's unfair competition claim contains an additional element or whether it is based solely on the alleged copying.

The basis of CoStar's argument that its unfair competition claim should not be preempted is that LoopNet did not merely copy its photographs, but passed them off as its own photographs. In doing so, CoStar alleges, LoopNet caused separate injury than by the mere act of copying because it caused its users to believe it had photographs equivalent to CoStar's or that it had authorization to use CoStar's photographs. Paper no. 94, at 34-35. Furthermore, CoStar asserts that *Waldman Pub. Corp. v. Landoll, Inc.*, 43 F.3d 775, 780 (2d Cir. 1994), stands for the proposition that this kind

of "reverse passing off," where a party passes off the goods of another party as its own, is not preempted by the Copyright Act. However, *Waldman* did not state that claims of reverse passing off are not preempted. Rather, it vacated on other grounds a district court decision holding that "[a] claim that a defendant has reproduced the plaintiff's work and sold it under the defendant's name--even if denominated 'passing off' by the plaintiff--is preempted by the Copyright Act." *American Movie Classics*, 922 F.Supp. at 934 (internal citation omitted). Essentially, CoStar's claim is that LoopNet is exhibiting as its own photographs on its web site that CoStar has an exclusive right to exhibit or license for exhibition. This type of reverse passing off is, in effect, a "disguised copyright infringement claim." 1 Nimmer on Copyright, §1.01[B][1][e], at 1-28 (2001); *see also American Movie Classics*, 922 F. Supp. at 934. The same act which constitutes LoopNet's alleged copyright infringement, the unauthorized copying of CoStar's photographs, also constitutes CoStar's unfair competition claim. Therefore, this claim does not satisfy the "extra-element" test and so is equivalent to CoStar's claim under the Copyright Act. Accordingly, it is preempted.

The determination of whether CoStar's remaining state claims are preempted similarly turns on whether they arise solely from copying or whether they require additional elements. CoStar characterizes its unjust enrichment claim as based not on the

54

copyright infringement, but rather upon misattribution of source arising from its Lanham Act claims. Paper no. 94, at 36. In *Wharton*, however, the court held that the plaintiff's claim of unjust enrichment was preempted by the Copyright Act because it "concerns the central allegation that Defendants plagiarized his copyrighted screenplay." *Wharton*, 907 F.Supp. at 146; *see also American Movie Classics*, 922 F.Supp. at 934 (holding preemption is appropriate where unjust enrichment claim does not allege that the defendants were enriched by anything other than copyright infringement). CoStar seeks to distinguish the present case from *Wharton* and *American Movie Classics* by asserting that those cases do not deal with a claim of passing off. Paper no. 94, at 36. However, as with CoStar's unfair competition claims, the court fails to discern a true claim for passing off and instead sees only a disguised copyright claim. Accordingly, CoStar's unjust enrichment claims are preempted.

Finally, CoStar seeks to rescue its intentional interference with business relations claim by asserting that LoopNet interfered with existing licenses as opposed to prospective business relationships as in *Wharton*. Paper no. 94, at 37, citing *Wharton*, 907 F.Supp. at 145-46. According to CoStar, in contrast to interference with prospective business relationships, interference with existing contracts is akin to a breach of contract claim, which is not preempted. *See Architectronics, Inc. v. Control*

*Systems, Inc.*, 935 F.Supp. 425, 440-41 (S.D.N.Y. 1996) (breach of contract claims are different and not preempted). However, in *Harper & Row, Publishers, Inc. v. Nation Enters.*, 723 F.2d 195, 201 (2d Cir. 1983), *rev'd on other grounds*, 471 U.S. 539 (1985), the Second Circuit held that a plaintiff's claim of tortious interference with contractual relations was preempted when it was based on the unauthorized publication of a work protected by the Copyright Act. It stated:

> The enjoyment of benefits from derivative use is so intimately bound up with the right itself that it could not possibly be deemed a separate element. *See* 1 Nimmer on Copyright § 1.01[B], at n.46 (1983). As the trial court noted, the fact that cross-appellants pleaded additional elements of awareness and intentional interference, not part of a copyright infringement claim, goes merely to the scope of the right; it does not establish qualitatively different conduct on the part of the infringing party, nor a fundamental nonequivalence between the state and federal rights implicated.

*Id.*

Therefore, as with CoStar's other state claims, the critical question to be decided is whether the alleged tortious interference depends on an extra element. In *National Car Rental Sys., Inc. v. Computer Assocs. Int'l, Inc.*, 991 F.2d 426, 433-34 (8th Cir. 1993), the Eighth Circuit found that a tortious interference claim was not preempted where a contractual restriction on the use of a computer program constituted an additional element. Similarly, in *Telecomm Tech. Servs., Inc. v. Siemens Rolm Communications, Inc.*, 66

F.Supp.2d 1306, 1326 (N.D.Ga. 1998), a case relied upon by CoStar for the proposition that the Copyright Act does not preempt intentional interference claims, the court found that claims were not preempted where the violation of licensing agreements and contractual provisions comprised an extra element. Even accepting CoStar's claims that LoopNet's alleged interference was with existing licenses as opposed to prospective relationships, the present case does not present an additional element similar to the the violation of contractual agreements by defendants in *Telecomm* or *National Car Rental*. Accordingly, CoStar's intentional interference claim is also preempted by the Copyright Act.

## IV. Modification of Preliminary Injunction

On March 14, 2000, the court entered a preliminary injunction, directing LoopNet to (1) remove from its web site all photographs for which it received notification of claimed infringement from CoStar; (2) notify the user who uploaded the photograph of CoStar's claim of the removal and that repeat acts of infringement might result in restrictions on the user's (or the brokerage firm's) access to the web site; and (3) with regard to identified brokers, require *prima facie* evidence of copyright ownership prior to posting a photograph. The injunction also required that other brokerage firms or offices later shown to the court's satisfaction to be repeat offenders after notice would similarly be subject to the *prima facie* showing requirement.

57

Dissatisfied with LoopNet's performance, and troubled by what it sees as escalating repeat infringements, CoStar seeks substantial modifications to the preliminary injunction. Specifically, CoStar seeks to require LoopNet to obtain a hand-signed written declaration of copyright ownership prior to any posting, to direct that any repeat infringer thereafter be prohibited from submitting any further photographs, to add to its database the address and property identification number of the 306 photographs thus far identified as infringing, and to order that failure to remove a photograph within 24 hours of notification from all locations and the reposting of any photograph will constitute evidence of direct contempt. In part, CoStar seeks to add additional firms or offices to the list of repeat infringers who are subject to the *prima facie* proof requirement. LoopNet disputes CoStar's factual recitations, and asserts that it has not only complied with the terms of the preliminary injunction, but has itself initiated further measures designed to prevent further unauthorized postings of CoStar's photographs. In a supplemental filing, CoStar claims that the *prima facie* evidence requirement is not inhibiting brokers from submitting non-infringing photographs, that LoopNet has posted a photograph without obtaining such evidence as required, and that there are additional repeat infringers. Again, LoopNet disputes both the facts and the conclusions drawn.

58

The court has reviewed the arguments and supporting material concerning LoopNet's compliance *vel non* with the preliminary injunction, as well as CoStar's requested enhancements.  As discussed at the hearing on December 15, 2000, CoStar would have to meet the standard for issuance of preliminary injunctive relief to obtain relief in the form of enhancements.  It has not done so. The facts are sufficiently disputed that the court cannot conclude that additional irreparable harm will befall CoStar if LoopNet is not required, for example, to obtain signed authorizations, or that such a requirement would not cause irreparable harm to LoopNet. Furthermore, in light of the court's resolution of the contributory infringement/safe harbor issues above, CoStar's likelihood of success has not been substantially demonstrated with regard to the potential enhancements being requested.  Finally, the public interest in access to the commercial information weighs against imposing any further impediments during the pendency of this litigation.  Accordingly, CoStar's request to modify the preliminary injunction IS DENIED to the extent that it seeks enhancements to the types of actions required of LoopNet.

On the other hand, application of the injunction requires the court to direct LoopNet to require *prima facie* evidence from those brokers or firms who post an alleged infringing photograph after notice that a previously posted photograph is claimed to infringe a CoStar copyright.  During the course of these proceedings,

LoopNet has implemented a probation/termination policy designed to deal with those brokers or offices that post an allegedly infringing photograph after removal of an earlier posting and accompanying notice. The court concludes that the policy, while helpful, does not go quite far enough in two ways. First, all brokers in an office in which any broker posted an allegedly infringing photograph after notice to any broker in that same office should be subject to the *prima facie* evidence requirement. And, for the purposes of the preliminary injunction, the brokerage office should remain in that status pending completion of this lawsuit.

When an office receives notice that one of its brokers has posted an allegedly infringing photograph, that office can be expected to monitor its own activities more vigilantly. Accordingly, if any broker in that office, whether or not the original offender, posts a second allegedly infringing photograph, then it is appropriate to require any broker in that office to provide *prima facie* evidence of the right to post a photograph. Thus, the gradations of "probation" cut too fine a distinction at this time. Furthermore, the discontinuance of probationary status in three, six, or twelve month intervals poses an enforcement problem for the court. The time necessary to review allegations of violations of either the policy or the injunction has become burdensome, not only to the parties, but to the court as well.

With the resolution of the issues set forth above, the case will move toward what, it is hoped, will be the final stages of the proceedings at this level. Accordingly, the court concludes that the status of "repeat infringer," once achieved, will remain during the pendency of these proceedings.

## V.  Conclusion

For the foregoing reasons, by separate order, both motions concerning the safe harbor defense of the DMCA will be denied, summary judgment will be granted in favor of LoopNet on direct infringement, both motions concerning contributory infringement will be denied, summary judgment will be granted in favor of CoStar on LoopNet's misuse defense, summary judgment will be granted in favor of LoopNet on the issues of statutory damages and preemption of the state law claims of unfair competition, unjust enrichment, and intentional interference with business relations, and the preliminary injunction will be particularized regarding repeat violators.

_Deborah K. Chasanow_

DEBORAH K. CHASANOW
United States District Judge

September 28 , 2001.

61